EMMA MELLICK

v.

HOWARD MELLICK.

1. A mortgage on lands, made to secure a money bond, gives to the mortgagee, before forfeiture, an "*interest*" in the land mortgaged, within the thirteenth section of the act for the prevention of fraud and perjuries. *Rev.*, *p. 446.*

2. An assignee of a bond and mortgage, holding under an assignment made by the assignor for the purpose of defrauding a subsequent purchaser of the securities, can, as against a subsequent purchaser for full value, derive no benefit from his assignment unless he is both innocent and ignorant of the fraud, and then only to the extent that he has parted with value on the strength of the assignment and before notice of the fraud.

3. He cannot, in such case, be allowed for past indebtedness against the assignor, unless he has given up some security or otherwise changed his position on the strength of the assignment.

4. Marriage is such a consideration for the subsequent assignment as will make the assignee a purchaser for full value.

5. Constructive notice to the subsequent purchaser of the prior assignment, arising from its record, will not affect the right of such subsequent purchaser.

6. A father, being the mortgagee and owner of two bonds and mortgages of $5,000 and $2,000, respectively, contracted with complainant, then a single woman, to marry her and had to settle upon her by assignment, before marriage, the $5,000 bond and mortgage. Nineteen days before the wedding, for the purpose of defrauding complainant, he assigned both bonds and mortgages to his son, the defendant, for the expressed consideration of $1 and love and affection, but actually received a consideration in money less than the amount of the smaller bond and mortgage. He afterwards regained possession of the $5,000 bond and mortgage and assigned the same to complainant just before his marriage with her.—*Held*, that the complainant was entitled to the benefit of the securities, notwithstanding that the prior assignment was recorded on the day it was executed, and that defendant was innocent and ignorant of the fraudulent scheme of his father.

On final hearing on bill, answer, cross-bill and proofs.

*Mr. J. G. Shipman*, *Mr. George M. Shipman*, and *Mr. Howell* (of the Easton bar), for the complainant.

*Mr. William H. Morrow* and *Mr. S. C. Smith*, for the defendant.

Mellick v. Mellick.

PITNEY, V. C.

By this suit complainant seeks to enforce, by foreclosure, a mortgage dated March 30th, 1877, to secure $5,000 in one year, with privilege of five years, with interest payable semi-annually, given by Joseph Kramer and wife to Henry H. Mellick, and by him assigned to complainant by her maiden name of Emma Keiter. This assignment bears date and was executed and acknowledged April 6th, 1878; and, on the same day, after the execution of the assignment and its delivery, with the bond and mortgage, to the complainant, she and the mortgagee, Henry H. Mellick, were married.

In 1879, Kramer, the mortgagor, failed. Judgments went against him, under executions upon which the mortgaged premises were brought to public sale in 1881, and purchased by Howard Mellick, the defendant. He does not dispute the validity of the mortgage, but sets up an assignment of it to himself by Henry H. Mellick, the mortgagee, who was his father, which is dated and was executed, acknowledged and duly recorded in the records of the proper county on the 18th of March, 1878, nineteen days prior to the execution of complainant's assignment.

It thus appears that the real contest is as to which of these two assignments conveyed, as against the other, the superior title to the mortgage in question.

The defendant's assignment purports to be in consideration of $1 and natural love and affection, with *habendum*—

" to the party of the second part his heirs and assigns, for himself and his and their own use, *after the death of the party of the first part*, on condition that the said Howard Mellick shall pay the interest received by him on said mortgage to the said party of the first part in semi-annual payments during his life-time."

Complainant's assignment recites the bond and mortgage, describes the land covered by it by metes and bounds, and then, in consideration of $1, grants, bargains, sells and assigns to the complainant the bond and mortgage and the lands so described, with the appurtenances, with unrestricted *habendum* to the complainant, subject to Kramer's equity of redemption, with these

words added: "said Mellick to draw the interest during his lifetime."

The complainant, by her bill, alleges that more than one month before the date of her assignment, and long prior to the date of defendant's assignment, Henry Mellick agreed with her that, if she would marry him, he would assign to her this bond and mortgage; that the said assignment was made and executed, and, with the bond and mortgage, delivered to her in consideration of such marriage and immediately before the same was solemnized. She further, by her bill, charges that the defendant's assignment was without any valuable consideration, was procured by the defendant from his father with full knowledge that the latter had contracted to assign the same to her in consideration of their approaching marriage, and was contrived by the father and son for the purpose of defrauding her in that affair, and is, for that reason, fraudulent and void as to her. She further, by her bill, alleges that in August, 1878, the defendant, acting in fraudulent collusion with her husband and Kramer, attempted to obtain possession from her by fraud of said bond and mortgage, and for that purpose, pretending a desire to endorse a payment of interest on the bond, asked complainant to produce both instruments for that purpose; that she did produce the bond and handed it to Kramer, who, after endorsing the payment on it, handed it to the defendant, who has since retained possession of it; and that Kramer handed her back, in place of it, an old canceled bond of Howard Mellick to his father.

Defendant, by his answer, denies complainant's allegation as to her assignment being given in consideration of marriage and the like, and puts her upon proof. As to his own assignment, he does not, by his answer, assert that it had any other consideration than that expressed in it. He further denies the allegations of the bill charging him with knowledge of the intended marriage, and of the alleged preliminary contract between complainant and his father to settle the bond and mortgage on her at their marriage; and he denies that his assignment was procured for the purpose of defrauding complainant. He also denies all complicity in the trick by which the possession of the bond

Mellick v. Mellick.

was procured from complainant.  He alleges that the bond and mortgage were delivered to him by his father on the 18th of March, and placed by him in his safe, to which, however, his father had access, and were taken therefrom by his father surreptitiously and without his knowledge, and their absence from the safe was not discovered by him until after his father was married, and, when discovered, he called his father's attention to it, and that he confessed that he had taken them and promised to return them, and did return the bond.

He further sets out in his answer, that after the marriage and after complainant had separated herself from his father, the latter was without any means of living except the interest on the bond and mortgage, and that

"he thereupon came to defendant and agreed to and with this defendant, that if this defendant would furnish to him a home with comfortable room, lodging and board for and during the term of the natural life of him the said Henry H. Mellick, that the same would be accepted by him the said Henry H. Mellick in full payment and satisfaction of *the interest which he the said Henry H. Mellick had or was entitled in and on the said bond and mortgage which he had assigned to the defendant*" &c.,

and " that he, the defendant, agreed with the said H. H. M. to furnish him board " &c., " in consideration of the said interest in and on said bond and mortgage " &c., and that, in pursuance of said agreement, defendant did furnish his father with such living &c. during his natural life ;

" and, in addition thereto, this defendant furnished said H. H. M. his clothing and several sums of money, amounting in the whole to the sum of $1,400 or thereabouts, which stands charged on this defendant's book against the said H. H. M., and that, in addition, he paid the funeral expenses of the burial of his father (who died just before the filing of the bill) and the amount whereof ought to be decreed to be deducted from any amount which shall be ascertained to be due in any wise from this defendant to H. H. M., if any such decree shall be made."

These citations from the answer have been given thus at length because they will appear to have an important bearing on the case as further developed.

The part of the answer set up as a cross-bill states that the existence of the uncanceled record of the mortgage is a cloud upon the defendant's title; that the instrument is wrongfully retained by complainant, and should be given up to him to be canceled, and prays accordingly.

At the hearing and argument the allegations and proofs of the parties took a range somewhat wider and, as to the defendant, decidedly variant from that marked out by the pleadings.

The complainant offered evidence tending to prove that the preliminary contract of marriage, after months of negotiation, was concluded in February, 1878 ; that by its terms Henry agreed to give complainant a conveyance of a certain house and lot, an assignment of the Kramer bond and mortgage, reserving the life estate to himself in each, and $500 in cash to buy furniture and other outfitting necessary to commence housekeeping in the house, and that March 18th, 1878, was fixed for the marriage.. With that view her *fiancé* produced to her the deed to him of the house and lot, and the bond and mortgage, and some two weeks prior to March 18th went with her to one Hillburn, a lawyer in Easton, Pa., stated to him the contract between the parties, left with him the three instruments, and instructed him to have papers prepared properly to carry out their contract ready to be executed and delivered at the time of the ceremony on the 18th of March. That, shortly before the 18th, Henry came to her and asked her to postpone the marriage until after April 1st, and to let him have the bond and mortgage in the meantime to enable him to collect the interest due on April 1st; that she consented. and went with him to Hillburn's office to enable him to get the bond and mortgage, which Hillburn had declined to deliver to him without her order, and that the 6th of April was then fixed for carrying out the contract. By this evidence complainant sought to carry her equity back to a period anterior to the 18th. of March, the date of defendant's assignment.

The defendant varied the case made by his answer by proof,. by his own and his clerk's oath and admissions of his father,. that at the time of the assignment he agreed with his father, as a. consideration therefor, to cancel an indebtedness which he had

Mellick *v.* Mellick.

against him amounting to upwards of $600, to loan him a further sum of about the same amount, and, further, to support him as long as he lived, thus setting up an actual consideration for his assignment not set up in his answer.

I come now to an examination of the testimony.

[Here follows a statement and discussion of the facts, which are omitted as unnecessary to a proper understanding of the points decided.—Rep.]

On this part of the case—if it were necessary to come to a definite conclusion as to whether the incidents detailed by the complainant and her mother as having occurred prior to March 18th, actually so occurred or not—I should, I think, upon a careful consideration of all the circumstances and evidence, feel constrained to conclude that they did, omitting, of course, the presence of the Kramer mortgage. Of course the mere absence of the mortgage from the papers taken to Hillburn's office before March 18th will not materially weaken whatever equity arose to complainant out of the transactions taking place prior to that date.

But I do not think it necessary to adopt a definite conclusion as to that part of the case, or to consider the value of the equity claimed by complainant's counsel to have arisen therefrom, and have spent so much time upon a review of these facts, for two reasons: first, that the parties may have the benefit of my view of them; and, second, for their bearing on what I conceive to be the real controlling question in the case, viz.: Did Henry Mellick make the assignment in question to his son for the purpose of practicing a fraud upon the complainant—either that which he afterwards carried into execution, or any other—based upon an apparent ownership of this bond and mortgage? Counsel for the defendant contend that he did not, and that it was made in good faith for the purpose stated by the son, and without any thought of, or by way of preparing for, the trick he afterwards played upon complainant—which counsel contend was entirely an afterthought—or for any other fraudulent purpose as against her. I cannot so believe. The evidence satisfies me that this contract of marriage was under negotiation for several months

Mellick *v.* Mellick.

before it took place; that money was advanced on the strength of it as early as January. In that connection, the money borrowed by the elder Mellick from the bank on January 2d, is significant; that the mother and daughter were all the time holding out for the best bargain they could get, and the lover was resisting them as best he could, and that finally, in his infatuation, he promised them this bond and mortgage, and sent to the clerk's office for the mortgage for the purpose of carrying out his contract; that either he, of his own accord, seeking some loophole of escape, adopted the scheme afterwards carried out, or Howard, becoming aware of his father's intention to marry, and fearing his future wife would get hold of his money, besought him, as he admits he did, to put his property beyond her reach, and thus, unwittingly it may be, suggested to him the trick by which he might succeed in getting the bride and keeping the price he agreed to pay for her, and that the old gentleman executed the assignment to Howard with this view, and intending to play the very trick on his bride which he afterwards did play.

He knew very well that, even if, in order to give the affair proper color, or to satisfy Howard, he must deliver the securities to Howard, yet he would have ample occasion and opportunity to regain their possession before the day fixed for the wedding, and so be able to deliver them to his wife at the altar; and he also, no doubt, thought that there was no danger that these simple, ignorant women, or their Pennsylvania counsel, would suspect him of any bad faith, or even think of examining the records for previous assignments. When he produced the securities themselves, in which he was named as the obligee and mortgagee, the possession of them was quite enough proof, to even a cautious business man, that he was still the owner of them.

My conclusion is, that the assignment to Howard was made for the purpose, on the part of the father, of practicing a fraud on the complainant.

Complainant's counsel contend that Howard participated in that fraud. This, of course, is not to be lightly inferred, but must be proven. Many circumstances point in that direction. Howard denies that he had any suspicion that his father meant

to marry the complainant. But I am satisfied that he must have more than suspected it. Mrs. Bowers, an inmate of his family in 1877, swears that the attention paid by the father to the complainant was discussed openly between father and son, and that she heard Howard say that his father intended to marry the complainant. The defendant admits that he knew that his father was visiting complainant, taking her to entertainments, and spending a great deal of money on her. In fact, these attentions were notorious, and he admits that they were the immediate cause of his solicitation of his father to make the assignments in question. He admits he saw Kramer daily. In September, 1879, he appears as a judgment creditor of Kramer for upwards of $3,000. In the summer of 1878 he asked Kramer to get possession of the mortgage, and when complainant, after the theft of August, 1878, made written demand on Kramer for the bond, he came at once, with the demand, to defendant. From these facts, it is easy to believe that Kramer reported to defendant the inquiries made of him by complainant and her mother about the mortgage as early, according to their story, as January or February. From all this, it is evident that Howard's principal object in procuring the assignments was to place these securities beyond the reach of the influence of complainant, both as the object of his father's present infatuation and as his probable wife. Such object was not necessarily fraudulent, but is consistent with honesty and fair dealing. A wife, on her marriage, acquires no property rights in her husband's personalty, and so the case is quite distinct from that of a wife, before the Married Woman's act, disposing of her personalty in view of present marriage, as in *Williams* v. *Carle, 2 Stock. 543,* and that class of cases. I conclude, therefore, that the proofs are not sufficient to warrant the conclusion that defendant was cognizant that his father made the assignment for a fraudulent purpose.

It is common learning that marriage is a valuable consideration, and quite as much so as cash. The complainant, then, stands in this court precisely as if, instead of marrying Mr. Mellick, she had paid him $5,000 in cash for this security. This was not disputed, but was frankly admitted at the argument by

counsel for the defendant.    She stands, therefore, as a *bona fide* purchaser for full value.

The earlier assignment having been made for the purpose of defrauding the complainant, and she having paid a valuable consideration for the later one, it seems to follow that a title under the later must prevail over that under the earlier, unless the claimant under the earlier deed was both innocent and ignorant of the contemplated fraud, and also paid or parted with a valuable consideration for it, and then he will be protected only to the extent of such consideration.

The case seems clearly within the thirteenth section of our statute of frauds.    That section is broader in its scope than its prototype, the *27 Eliz. c. 4*, which declared, " that all and every conveyance &c. of, in or out of any *lands, tenements* or other *hereditaments* " made to defraud subsequent purchasers, shall be void &c. against such subsequent purchasers &c., while our statute declares, " that every conveyance, grant or alienation of land, tenements or hereditaments, or *of any estate or interest therein*," made with intent to defraud &c. such persons &c. as shall purchase such lands, tenements or hereditaments, or *any estate, right or interest therein*, shall be deemed and taken to be void as against such purchasers &c.

It seems to be the rule in England, that a sum of money secured by a charge on land is not within the English statute (*May Fraud. Conv. 204*), and that an ordinary estate under an ordinary mortgage is in the same category, though no direct adjudication to that effect was cited.    But it seems to me impossible to hold that the interest of an ordinary mortgagee of lands in New Jersey is not within the language as well as the spirit of our statute.    That language is too broad and sweeping to admit of such construction, and although our courts have reduced a mortgage interest before forfeiture to a low level (*Sanderson* v. *Price, 1 Zab. 637; Wade* v. *Miller, 3 Vr. 296; Osborne* v. *Tunis, 1 Dutch. 633; Shields* v. *Lozear, 5 Vr. 496; Verner* v. *Betz, 1 Dick. Ch. Rep. 256*), yet no case has gone so far as to hold that the mortgagee has neither *estate* nor *interest* in the lands mortgaged.

Mellick *v.* Mellick.

The defendant's assignment conveyed to him the bond and mortgage in question, and with them the interest of the mortgagee in the mortgaged premises, and it is upon this theory that the act providing for the recording of such instruments is based.

But I do not think it necessary to resort to the statute in question in order to determine the true value of defendant's assignment. The legislation in question has always been construed as merely declaratory of the common law, and resort might always, and without the aid of the statute, have been had to equity for relief against the transactions aimed at by it.

Lord Mansfield, in *Cadogan* v. *Kennett, Cowp. 432* (at *p. 434*), says : " The principles and rules of the common law, as now universally known and understood, are so strong against fraud in every shape, that the common law would have attained every end proposed by the statutes of *13 Eliz. c. 5* and *27 Eliz. c. 4.* The former of the statutes relates to *creditors* only ; the latter to *purchasers.* These statutes cannot receive too liberal a construction, or be too much extended in suppression of fraud."

And Lord Cranworth, in *Perry-Herrick* v. *Attwood, 2 De G. & J. 40 (27 L. J. (N. S.) Eq. 121, 128,* a better report), says : " If the intention of the parties to the transaction here in question was that the Misses Attwood should have this security, but that, nevertheless, Mr. Attwood should keep the title-deeds, that he might be enabled thereby to deal with the estate in favor of third parties, I am strongly disposed to think that the security comes within the statute ; it certainly comes within its principle. If the case does [not] come within the statute, the only difference that makes is, that the Misses Attwood have not the legal estate, and so could not maintain ejectment against the plaintiffs, *but that would not in any degree oust the jurisdiction of this court, such jurisdiction having existed long prior to the statute, and not being in any degree defeated by an act which can only have been intended to give a more clear and distinct jurisdiction and a more extended remedy.*"

The supreme court of the United States, in *Hamilton* v. *Russel, 1 Cranch 310* (at *p. 316*), lays down the same doctrine and applied it to the case of a slave. And see *May Fraud. Conv. 3, 4.*

I know of no reason why this court should not lend its aid to protect against fraud, in dealing with a chattel interest of this character, as readily as with pure interests in realty, where, as here, there is a lack of legal remedy and the question arises in a cause in which this court has unquestioned jurisdiction. And, I may add, it seems to me, it would be a reproach to our system of justice if it could be said of it that it would permit such a transaction as that now before us to stand, and leave the party defrauded by it remediless.

It remains to consider what rights the defendant acquired under this assignment, supposing him, as I do, to be both innocent and ignorant of the particular fraud contemplated by his father. He swears that he gave and promised to give a valuable consideration for his assignment, the particulars of which are as follows: First, that he forgave his father a present indebtedness which he had against him of upwards of $600, and further advanced to him upwards of $600 immediately after the making of the assignment and before he had notice of the fraud; and that he supported him during his lifetime and buried him, all in pursuance of a verbal contract so to do made at the date of the assignment. The fact that the deed itself is expressed to be in consideration of $1 and love and affection, and reserves the interest on the security during the father's lifetime, and that it was drawn by the son's counsel, is strong evidence against this contention, but is not conclusive, and the defendant may, nevertheless, overcome it by evidence of what the real consideration was. But the frame and allegations of his answer are more serious obstacles in his way. He is a man of intelligence and business experience, and had, from the start, the aid of competent counsel, and it is difficult to conceive why, if the facts afterwards set up at the hearing really existed, they were not set out in the answer; and it is equally difficult to understand how counsel could, on that basis of fact, have set out in their answer, as they did, these very items of consideration as having been paid years after the assignment, and that the board and lodging was furnished in consideration of the interest which accrued on the securities.

Mellick *v.* Mellick.

Again, the answer alleges that the items going to make up the $1,400 of moneys advanced are entered on defendant's books, and yet not a scratch of a pen was produced at the hearing in support of these payments, except a promissory note of the father for $250, which matured and was paid by the son on the 4th of April, 1878, two days after the father collected his interest from Kramer. Nor are the items given. Their absence is a marked feature in the case.

But, accepting the statements of the defendant made at the hearing as true, and allowing him to amend his answer, as asked at the hearing, to correspond with this statement, it is still to be remarked, that defendant cannot be allowed for the debt of over $600 which he says his father owed him on the 18th of March, since a prior indebtedness will not avail him as grantee of a fraudulent deed. And as to his undertaking to support his father, that was not in writing, and nothing was done under it until long after he had full notice of the fraudulent character of his assignment, and of the superior equities of complainant, which absolved him from all obligation in the premises.

Counsel for the defendant stoutly combatted the position that defendant could be allowed for no more than he actually advanced, and further claimed, that the payment of a less sum than the admitted money value of the securities was sufficient to invest him with a complete title to the whole fund secured by them. The cases cited by counsel in support of this contention were all conveyances of land or leasehold interest in land, and, so far as applicable to the present case, were instances of dealing with the familiar English rule (to which I will again refer), that purely voluntary settlements of land were void under *27 Eliz. c. 4* as against subsequent purchasers, no matter how free they were of any actual fraud. Of late years the English judges have caught at very small matters of consideration for such voluntary settlements in order to relieve against the hardship of this rule. In one of the cases cited by counsel, *Bayspoole v. Collins, L. R. (6 Ch. App.) 228*, Lord Hatherly (*p. 232*) says: "With regard to the observation which was made by counsel, that purchasers would hardly know how they are to

7

deal with property where there has been a voluntary settlement, I do not think anything could be more unsatisfactory than what we find to be the state of the law under which a person, with full and distinct knowledge of a voluntary·settlement, is able at any time to overthrow it. It is quite established that, although a settler cannot get rid of such a settlement directly, he can do so indirectly by making a mortgage of the property to somebody else for the purpose of being able to destroy the settlement.

"Now, it is not for me to say whether the mode by which the *court has attempted to remedy some of the evils of this state of the law, namely, by holding that a small and inadequate consideration is sufficient to support such a settlement* under the statute of *Elizabeth,* has diminished the extent of the mischief. But so it is, that a very small consideration is admitted to be sufficient."

*Price* v. *Jenkins, L. R. (5 Ch. Div.) 619,* went on the same ground. It was a mere direct attempt by the settler to avoid his settlement by making a mortgage. This line of cases has no application to a transfer of an interest capable of precise measurement in money value, nor to one where there is actual fraud in the prior settlement or conveyance.

With regard to so much of the consideration as consisted of past indebtedness, it does not appear that the defendant gave up any security or lost any opportunity to enforce any such, or was prejudiced in any way in regard to his father's indebtedness to him by what occurred in connection with the assignment. The abstraction of the securities and their assignment to complainant absolved him from all obligation to forbear the enforcement of his debt. That such past indebtedness would not sustain the equitable plea of *bona fide* purchaser seems clear. *2 Lead. Cas. Eq. (4th Am. ed. 1887) 77, 82 et seq. ; Allaire* v. *Hartshorne, 1 Zab. (2d ed.) 665, 668 at bottom; Holcomb* v. *Wyckoff, 6 Vr. 35.*

This subject is discussed by Vice-Chancellor Van Fleet, and the rule settled in this court in *De Witt* v. *Van Sickle, 2 Stew. Eq. 209.*

It thus appears that defendant's right, on his own showing, is reduced to such actual cash payments as he can show that he made to his father, or on his account, in good faith, at or after

the date of his assignment and before notice of the fraud practiced on complainant, and, as to them, he offers no proof but his own oath, except as to the $250 note. I have already shown that, for the reasons given, I can place little or no confidence in his unsupported evidence.

But there is another fact proven which relieves this part of the case of all difficulty. At the same time that his father assigned to defendant the Kramer bond and mortgage, he also assigned to him a bond and mortgage for $2,000, made by the defendant himself and one Case to his father (called in the evidence the "Case bond and mortgage"), which assignment was expressed to be made upon precisely the same consideration and terms as that of the Kramer securities. There was no contention that any other or further consideration was given for this assignment than that expressed in it. The two transfers constitute one transaction, and were made upon the same consideration, whatever that was. There was no contention that the smaller security was not perfectly good and worth its face value. It was in fact the obligation of the defendant himself, and was of course ample to cover defendant's claim for past indebtedness and present payments. Then, as to the Kramer security, he paid his interest on it, as appears by endorsements on the bond, until about the time that the defendant became the purchaser of the equity at sheriff's sale, and from that time forward the defendant, as he says in his answer, paid, as he was bound to do, the interest by supporting his father. At all events, there was no pretence, at the hearing, that the interest on the two securities, together with the principal of the smaller one, was not amply sufficient to indemnify the defendant in the premises, and indemnity is all that he is entitled to.

But defendant relies, with great confidence, on the fact that his assignment was duly and immediately recorded, so that complainant is chargeable, under the statute, with constructive, but conclusive, notice of it, and that her equity is destroyed thereby. I cannot accede to that proposition. It is true that the complainant could not set up the ordinary plea of *bona fide* purchaser without notice, and by it overcome a prior assignment for value.

But she is not seeking so to do; and the defendant's case is not that of a prior purchaser for value. The real question is, whether constructive notice to the party intended to be defrauded can eliminate from the transaction the fatal element of fraud inherent in it, or add to it the fatal want—a valuable consideration. I think it can not. Notice has no curative or creative power. It cannot purify that which is essentially vicious, or in any wise or degree change the inherent character of a transaction. It preserves rights, but does not create them. It is on this principle that it was originally held that notice of the prior settlement to the subsequent purchaser would not defeat the latter's superior right under *27 Eliz. c. 4.* Within five years after the passage of that act, in *Gooch's Case, 5 Coke 60,* Wray, C. J., says:

" If A, seized of land in fee, makes a fraudulent conveyance to the intent to deceive and defraud purchasers against the statute of *27 Eliz.,* and continues in possession, and is reputed as owner, B enters into discourse with A for the purchase of it, and by accident B has notice and knowledge of this fraudulent conveyance and, notwithstanding, concludes with A and takes his assurance of him, in this case B shall avoid the said fraudulent conveyance by the said act, notwithstanding his notice; *for the act has, by express words, made the fraudulent conveyance void as to a purchaser ;* and forasmuch as it is within the express purview of the act, it ought to be so taken and expounded in suppression of fraud." "And," the report continues, " according to the opinion of Lord Wray, it was unanimously agreed and resolved by the whole court of common pleas, *Pasch. 3 Jacobi,* in evidence to a jury in an *ejectione firmœ,* on a lease made by Standen to House, plaintiff, against Bullock, defendant, that where one Bullock had made a fraudulent estate of his land within the said act of *27 Eliz.* to A, B and C, and afterwards, notwithstanding, offered to sell the said land to Standen, and before assurance thereof made by Bullock, Standen had notice of the said fraudulent conveyance and, notwithstanding, proceeded and took his assurance of Bullock, that Standen should avoid (by the said act) the said fraudulent conveyance; *for the notice of the purchaser cannot make that good which an act of parliament made void as:*

·to *him*.   *   *   *   *But in that case the purchaser is not deceived ;
for the fraudulent conveyance, whereof he has notice, is void as to
him by the said act, and therefore shall not hurt him, nor is he, as
to that, in any manner deceived."*

And see the language of Lord Ellenborough in *Doe* v. *James,
16 East 213.* The maxim that " he is not deceived who knows
that he is deceived," has no application to such a case, and in
fact can have no application to any case of mere constructive
notice, however conclusive.

The English courts, however, went further than the doctrine
laid down in *Gooch's Case,* and finally held that a voluntary
settlement, though made in good faith and without any present
intention to defraud any person, was fraudulent against the subse-
quent purchaser, however remote in time. The result was to give
the settler power to revoke his settlement at his option. This
·doctrine has often been criticised and regretted in England (*Doe*
v. *Manning, 9 East 59 ; Rob. Fraud. Conv. 39–41 ; May Fraud.
·Conv. 195*), and has been repudiated in this· country. *Sterry v.
Arden, 1 Johns. Ch. 261, 12 Johns. 536 ; Cathcart* v. *Robinson, 5
Pet. 280 ; Beal.* v. *Warren, 2 Gray 447.* But a careful consider-
ation of the numerous criticisms made upon the English doctrine
will, I think, show that they are directed more against the notion
involved in it of constructive fraud, imputed by relation retro-
actively to a transaction which was originally innocent, than to the
position that, where the transaction was originally fraudulent,
notice of it to the subsequent purchaser could not purge the fraud
and validate it. I have found no decision holding that notice in
such cases validates the transaction, nor any suggestion that the
doctrine now contended for is unreasonable or illogical. Judge
Spencer prefaces his bold attack on the English doctrine in *Ver-
plank* v. *Sterry, 12 Johns. 536* (at *p. 557*), with this language :
" It is a sound and settled principle, that notice to a purchaser,
of a prior *fraudulent* deed, will not affect the subsequent pur-
·chaser, and that such subsequent purchaser may avail himself
·of the fraud in the first deed ; and the reason for this is solid,
.because *if he knew the transaction, he knew it was void by law.*"

Mellick *v.* Mellick.

The same principle is acted upon in the case of conveyances of land made for the purpose of defrauding future creditors. It is, well settled that in order to avoid such conveyances as to subsequent creditors, they must have been conceived in *actual* as distinguished from mere constructive fraud. And it is equally well settled, that when such fraud clearly appears, the registry of the fraudulent deed will not help it when attacked by a subsequent creditor.

In this connection I cannot but think and remark that there must, in a case like this, be a distinction between the effect of *actual* notice and that which is constructive merely. Chancellor Kent evidently so thought in *Sterry* v. *Arden, 1 Johns. Ch., 261;* and see the remarks of Mr. Bishop in *2 Bish. Mar. W.* § *345,* and, also, *Rob. Fraud. Conv. 39 et seq.* Absence of actual notice must at least have the effect of showing the perfect good faith of the subsequent purchaser.

Nor do I think there was any lack of prudence or caution attributable to complainant in this transaction. Here the obligee and mortgagee named in a bond and mortgage produced those instruments with no marks upon them indicating that he had parted with his property in them, but with an endorsement showing a recent payment of interest to him as owner, and he proposed to assign them for full value. I think an ordinary business man would not, under the circumstances, have been considered lacking in prudence and caution if he had advanced money upon them without examining the records for prior assignments. If carelessness be attributable to any party, it is to the defendant, who permitted his father to have full access to these papers, and seems to have expected that he would himself have the possession of them for the purpose of collecting the interest.

I think the complainant's equity is clear, and that she is entitled to the relief prayed for, namely, an ordinary decree for foreclosure. In computing the amount due, interest will be allowed from the date of her husband's death. If that can be agreed upon, the court can compute the interest without a reference.